IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Margaretta Zimmerman, | ) | C/A. No. 4:03-2379-RBH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| Metropolitan Life Insurance Company and | ) | |
| Citifinancial Salary Continuation Plan, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court pursuant to the parties Joint Stipulation, wherein it was agreed

that the Court may dispose of this matter based upon the Joint Stipulation, the administrative record,

the plan documents, and each parties' memorandum in support of judgment.[1]  The Complaint in this

case was originally filed in this Court on August 7, 2003, alleging a single cause of action for the

recovery of short term ("STD") and long term ("LTD") disability benefits pursuant to 29 U.S.C. §

1132(a)(1)(B).  Defendants timely answered the Complaint, denying the material allegations therein

and raising several affirmative defenses.  Both the Citifinancial Salary Continuation plan (STD

benefits) and the Citigroup Inc. Long Term Disability plan (LTD benefits) (collectively the "Plans")

---

[1] The Fourth Circuit has recognized that there is no prohibition against the parties agreeing to do away with
the summary judgment standard and simply allowing the court to dispose of a matter on its' merits by way of
stipulation. See *Bynum v. CIGNA HealthCare of North Carolina, Inc.*, 287 F.3d 305 (4th Cir. 2002), footnote
14, where the court stated:
> "While the parties' agreement to waive the summary judgment standards and submit their
> case to the district court on its merits seems to be unique, the ERISA statute does not
> preclude such an agreement.  *See also Tester v. Reliance Standard Life Ins. Co.*, 228 F.3d
> 372, 374, 377 (4th Cir. 2000) (affirming decision of district court after bench trial where
> parties agreed for court to decide ERISA claim on merits and doing away with summary
> judgment standard.)."

1

are governed by ERISA.[2]

## **Factual and Procedural History**

Citigroup, Inc. established and maintained the plans, which provide eligible employees with certain benefits in the event of short-term and long-term disability as defined under the terms of those plans. The STD plan is self funded by Citigroup, while the LTD Plan is funded by MetLife Group Policy No. 1137000-2-G. (A.R. 1.) The STD plan allows for the continuation of base salary for up to thirteen (13) weeks for an approved disability. (A.R. 342.) The LTD plan provides benefits only for those disabilities that continue beyond thirteen (13) weeks. (A.R. 16.) The plans both provide that the plan administrator and other plan fiduciaries have discretionary authority to interpret the plan and determine eligibility for benefits. (A.R. 49, 264, 340.) MetLife is the claims administrator for the plans and, as such, an ERISA fiduciary. MetLife denied plaintiff's benefits on the basis that plaintiff failed to demonstrate she was laboring under a disability as defined by the written terms of the plans.

Until December 2002, Zimmerman was actively employed with Citifinancial and she participated in the Citifinancial Salary Continuation plan ("STD" or "salary continuation" plan) and a long term disability plan insured by Defendant Metropolitan Life Insurance Company ("LTD plan"). Zimmerman originally ceased working due to health problems in December of 2002. Zimmerman filed a claim for STD benefits and initially, at least, MetLife approved Zimmerman's claim for the period December 5, 2002 through February 6, 2003.

On December 5, 2002, plaintiff was hospitalized for heart failure, bronchitis, and hypertension. (A.R. 131.) Plaintiff remained in the hospital until December 8, 2002. (A.R. 131.) On December 18, 2002, due to her absence from work, plaintiff's eligibility for STD benefits was referred to MetLife

---

[2] Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq*.

for review. (A.R. 129.) On December 19, 2002, after discussions with plaintiff's doctors, plaintiff

was approved for STD benefits from December 5, 2002, through January 15, 2003. (A.R. 131.) On

January 20, 2003, plaintiff contacted MetLife's case manager and informed her that on January 16,

2003, she had been readmitted to the hospital for high blood pressure and low potassium where she

remained until January 19, 2003. (A.R. 132.) Plaintiff was informed by the case manager that her

STD benefits could not be extended without reports from her attending physicians. (A.R. 132-33.)

After conversing with an assistant to plaintiff's treating cardiologist, Dr. Linda Shuck, the case

manager extended benefits until February 6, 2003. (A.R. 133.)

On January 29, 2003, MetLife wrote to Zimmerman and advised that her short term disability

benefits would be exhausted on March 5, 2003[3] and that Zimmerman's claim for LTD benefits was,

therefore, being evaluated. During the review process, on January 24, 2003, Dr. Linda Shuck

completed a questionnaire wherein she stated that Zimmerman suffered from congestive heart failure[4]

("CHF"), hypertension[5] ("HTN"), and hypokolemia[6]. (A.R. 217.) Dr. Shuck also outlined

Zimmerman's treatment plan and listed her current medications as being Demadox, K-Dur, Aldactone,

Cozaar, Lotensin, Labetalol. Dr. Shuck advised that she did not know when Zimmerman would be

---

[3] The short term disability plan provides up to thirteen (13) weeks of benefits and when those benefits are exhausted the LTD benefits begin.

[4] "Congestive heart failure" is defined as "inability of the heart to keep up with the demands on it and, specifically, failure of the heart to pump blood with normal efficiency." (See www.medterms.com)

[5] "Hypertension" is defined as "high blood pressure, defined as a repeatedly elevated blood pressure exceeding 140 over 90 mmHg -- a systolic pressure above 140 with a diastolic pressure above 90." (See www.medterms.com)

[6] "Hypokolemia" is defined as "low blood potassium." (See www.medterms.com)

able to return to work either full time or part time.  She also mentioned restrictions regarding heavy

lifting or prolonged standing.

On February 5, 2003, pursuant to the case manager's request, Dr. Shuck responded to a second

Physician Questionnaire indicating that plaintiff was not limited from a cardiac standpoint and that

she was expected to return to work by February 7, 2003.  (A.R. 177.)  Based on Dr. Shuck's

assessment, plaintiff's STD claim file was closed.  (A.R. 136.)  By letter dated January 24, 2003,

plaintiff was informed by MetLife that she was expected to return to work on February 7, 2003, and

that her file would be closed unless MetLife was provided with additional medical information

indicating that she could not return to work.  (A.R. 228.)  On February 7, 2003, plaintiff failed to

return to work.  (A.R. 135.)

The day she was expected to return to work, MetLife received a telephone call from plaintiff

indicating that her primary care physician, Dr. Emmanuel Quaye, recommended that she was

permanently disabled and should not return to work.  (A.R. 136.)  Plaintiff was informed that her file

would remain closed until her claims were confirmed with Dr. Quaye.  (A.R. 136.)  On March 4,

2003, MetLife's case manager received responses to a Physician Questionnaire from Dr. Quaye

indicating she was moderately limited, her diagnosis was congestive heart failure, and, without

explanation, recommended that plaintiff should not return to work at this time.  (A.R. 179.)  In

response, the case manager referred plaintiff's claim to a Medical Nurse Case Manager who attempted

to contact Dr. Quaye to pose the following questions: (1) Why do you contend plaintiff is unable to

return to work when Dr. Shuck says otherwise; and (2) If plaintiff is not able to return to work now,

when can she return to work.  (A.R. 147, 137.)  The questions and concerns over Dr. Quaye's opinion

4

were not resolved because the Medical Nurse Case Manager was unable to speak with him.  (A.R. 139-40.)

Until June 2003, plaintiff served as an Assistant Manager for Citifinancial, and, was eligible for coverage under the Plans.  As Assistant Manager, according to the Citifinancial job description, plaintiff was responsible for sales and service and largely dealt with "complex customer situations." (A.R. 150.)   The essential job functions of plaintiff's job included sales and credit analysis (35%), business development (35%), collections (20%), account maintenance/customer service (10%), and branch administration (10%).  (A.R. 150-151.)   According to the job description, the physical demands are as follows:

- Eye strain from continual use of computer screens    90%
- Constant use of phone    90%
- Ability to sit for extended period of time    75%
- Ability to travel to inside and outside local area
  (i.e., bank, post office, courthouse and assigned area)    10%
- Ability to do outside collection calls    10%.

(A.R. 52.)

The relevant portions of the short term disability and long term disability plans are as follows. As defined by the STD plan,

Disabled or Disability means that, due to sickness, pregnancy or accidental injury, you are:

- receiving appropriate care and treatment from a doctor on a continuing basis; and

- medically unable to perform the essential duties of your own occupation for any employer because of a physical or mental impairment.

You are not considered to have a disability if your illness, injury, or pregnancy only prevents you from commuting to and from work.

5

(A.R. 342.)

Regarding whether a claims administrator has discretionary authority, the short term disability plan states:

> Under the terms of the Plan, the Claims Administrator is the named fiduciary for adjudicating claims for benefits under the Plan, and for deciding any appeals of denied claims. The Claims Administrator shall have the authority, in its discretion, to interpret the terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Claims Administrator shall be final and binding on participants and beneficiares to the fullest extent permitted by law.

(A.R. 353.)  According to the LTD plan:

> If you are a member of Class I,[7]    "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
>
> 1.       during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or at your Own Occupation for any employer in your Local Economy; or
>
> 2.       after the 24 months period, you are unable to earn more than 60% of your Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonable [sic] qualified taking into account your training, education, experience and Predisability Earnings.
>
> If you are a member of Class II, "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
>
> 1.       during your Elimination Period and the next 60 month period, you are unable to earn more than 80% of Predisability Earnings at your Own Occupation for any employer in your Local Economy; or

---

[7] The LTD Plan defines Class I, II, III, and IV employees as follows:
Class I:  All Eligible Employees earning $50,000.00 or less.
Class II:  All Eligible Employees earning at least $50,001.00, up to and including $149,999.99.
Class III:  All Eligible Employees earning $150,000.00, up to and including $300,000.99.
Class IV:  All Eligible Employees earning $300,001.00, up to and including $500,000.00.
(A.R. 15.)

2.  after the 60 months period, you are unable to earn more than 60% of your Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonable [sic] qualified taking into account your training, education, experience and Predisability Earnings.

If you are a member of Class III or IV, "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis and you are unable to earn more than 80% of your Predisability Earnings at your Own Occupation for any employer in your Local Economy.

Your loss of earnings must be a direct result of your sickness, pregnancy or accidental injury.  Economic factors such as, but not limited to, recession, job obsolescence, paycuts and job-sharing will not be considered in determining whether you meet the loss of earnings test.

"Appropriate Care and Treatment" means medical care and treatment that meet all of the following:

1.  it is received from a Doctor whose medical training and clinical experience are suitable for treating your Disability;

2.  it is necessary to meet your basic health needs and is of demonstrable medical value;

3.  it is consistent in type, frequency and duration of treatment with relevant guidelines of national medical, research and health care coverage organizations and governmental agencies;

4.  it is consistent with the diagnosis of your condition; and

5.  its purpose is maximizing your medical improvement.

"Doctor" means a person who: (i) is legally licensed to practice medicine; and (ii) is not related to you.  A licensed medical practitioner will be considered a Doctor:

1.  if applicable state law requires that such practitioners be recognized for the purposes of certification of disability; and

2.  the care and treatment provided by the practitioner is within the scope of his or her license.

7

"Own Occupation" means the activity that you regularly perform and that serves as your source of income. It is not limited to the specific position you held with your Employer. It may be a similar activity that could be performed with your Employer or any other employer.

"Local Economy" means the geographic area surrounding your place of residence which offers reasonable employment opportunities. It is an area within which it would not be unreasonable for you to travel to secure employment. If you move from the place you resided on the date you became Disabled, we may look at both that former place of residence and your current place of residence to determine local economy." (Emphasis added) The "own occupation" definition of "disability" is at issue before the court.

(A.R. 23-24) Additionally, the LTD plan also provides MetLife discretionary authority as follows:

In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious."

(A.R. 23-24.) The "own occupation" definition of "disability" is at issue before the court. Although the definitions of "disability" differ slightly in the STD and LTD plans, both definitions essentially require Zimmerman to demonstrate that she is unable to do the essential duties of her "own occupation" or one very similar to it.

As a result of MetLife's investigation, the following decision terminating STD benefits was issued:

We have completed review of your claims for additional benefits under your group salary continuation plan. We have determined that benefits beyond February 6, 2003, must be denied.

Your employer's plan states the following:

"Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you:

8

1. are receiving Appropriate Care and Treatment from a Doctor on a continuing basic [sic]; and
2. if you are medically unable to perform the essential duties of your own occupation for any employer because of a physical or mental impairment. You are not considered to have a disability if your illness, injury, or pregnancy only prevents you from commuting to and from work.

Our records indicate that your disability began on December 5, 2002 citing the cause of your disability as Congestive Heart Failure.  A telephone call was placed to your physician's office, Dr. Linda Shuck, MD on January 21, 2003 where they verified you were admitted back in the hospital on January 16, 2003.  Therefore, your claim was initially approved from December 5, 2002 through January 15, 2003 with a return to work date of January 16, 2003.

On January 24, 2003, we received a medical update stating that you will be off work until your next office visit on February 6, 2003, due to congestive heart failure and hypertension.  Therefore your claim was extended through your next office visit on February 6, 2003.  We received your medical update from Dr. Shuck's office on February 6, 2003 indicating that you were seen on February 3, 2003 with no limitations from a cardiac standpoint and you should return to work full time on February 7, 2003.

On February 7, 2003 we received a phone call from you, stating that you did not return to work on February 7, 2003 because you went to see your primary care physician, Dr. Quaye, whom you stated, told you that you were not able to return to work because he feels that you may be permanently disabled.  You were told to have Dr. Quaye's office fax us the reason why he felt you were unable to return to work on February 7, 2003, at which time a further investigation was needed to determine continued eligibility.

On March 4, 2003 we received a physician questionnaire from Dr. Quaye's office, stating that your current functional limitations were moderately limited, and that your current diagnosis was Congestive Heart Failure.

In order to give your claim further consideration, we referred your claim to our Medical Nurse Case Manager.  Our Nurse placed a phone call to Dr. Quaye's office but was unable to speak with Dr. Quaye.  The conclusion of this review was that the available documentation does not support continued disability.  The current available medical information does not show any restrictions or limitations.  The notes showed, chest is clear, good excursion, no cyanosis, no clubbing and your blood pressure was good.  The note also stated that you may be a candidate for disability.  Despite your pain, it is not clear why you would be unable to perform the duties of your own occupation as an Assistant Manger at Citifinancial.

> In summary, although Dr. Quaye stated that your diagnosis is congestive heart failure, your cardiologist Dr. Shuck, states your current signs and symptoms are none from a cardiac standpoint. Therefore, based upon review of the information submitted, you do not qualify for benefits beyond February 6, 2003. We did not find evidence in your medical information to substantiate that you had a functional impairment severe enough to prevent you from performing your own occupation. Your request for Short-Term Disability benefits beyond February 6, 2003, has been denied.

(A.R. 146-47.) Plaintiff was also notified of her right to appeal the denial of STD benefits beyond February 6, 2003.

On March 27, 2003, without the assistance of counsel, Zimmerman appealed the denial of her claims, and submitted a number of materials to MetLife in support of her claim. Zimmerman submitted her own statement as follows:

> I am in receipt of your denial letter dated 3/6/03.

> Per our conversation prior to receiving this notification and from a conversation with "Robin" today. I am writing to you to begin initiation of the appeal process of this claim.

> As stated previously I have been under the care of all physicians, SCHC – L. Shuck and Primary Care of Hartsville – E. Quaye, since 12/5/02 SCHC) and 10/22/02 (Prim. Care) and am still being seen on a continuous basis by both physicians. I have not been released by either MD to return to work.

> Upon visiting the SCHC this month I informed Dr. L. Shuck that your office received a release letter from her office and that you would not base your decision on Dr. Quaye's statement. Dr. Shuck informed me that she and Dr. Quaye would provide further information to you in regards to my continued absence from work.

> Upon visiting Dr. Quaye's office this month the SCHC was faxing to him their letter to be included with his letter to be faxed to you regarding treatment, symptoms and conditions. Robin informed me that I need not go into details of treatment or condition since I will still under the physicians' care, but in your letter it states otherwise. Please see additional letter.

Zimmerman also submitted a separate statement she had authored:

10

> Due to side effects of medication taken I have constipation, nausea, diarrhea, hemorrhoids, shortness of breath, bad coughing spells, weakness in legs, hands, arms, fatigue, dry mouth, numbness, pain and swelling.  I take 20 plus prescribed pills per day.  From heart medication to blood pressure medication to bronchials to meds for acid reflux and pain.  It takes the majority of these to keep the blood pressure under control and the potassium level up and at this time the side effects are still there from these meds.

(A.R. 164.)  Zimmerman also submitted her medical records which set forth that she suffers from "congestive heart failure (enlarged and weakened heart)", and that she takes prescription medications, including Lotensin, K-Dur, Labetalol, Cozaar, Protonix, Demadox, Quinine sulfate, Aldactone, Reglan, Laxis, Avalide, and Coreg.

On March 31, 2003, additional medical information was received from Dr. Shuck via letter. In her letter, Dr. Shuck wrote:

> Ms. Margaretta Zimmerman is a 45-year-old obese black female that we are seeing due to congestive heart failure and malignant hypertension.  The patient is very limited at this point from her cardiovascular status and also from her obesity.  This combination is causing it to be very difficult in order to control her edema and her blood pressure. The patient is very limited at this point and with any type of activity becomes very dyspneic[8] and weak with minimal exertion.  At this point in time, I do not feel the patient is able to return to work.  Please disregard the updated questionnaire faxed on 02/06/03 since clearly the patient will not be able to return to work at this time.
>
> If you should have any questions, please feel free to contact me.

(A.R. 165).  On April 4, 2003, the plaintiff's claim was referred to Dr. J.W. Rodgers, an Independent Physician Consultant board certified in Internal and Pulmonary Medicine, for review.  (A.R. 142.)

On April 16, 2003, Dr. Rodgers issued the following report:

> I had the pleasure of reviewing the file on the above-mentioned claimant.  As you know, she went out of work on 12/5/02 based on congestive heart failure.  Our file includes the admission history and physical, as well as discharge summary dictated by her attending cardiologist, Dr. Linda Shuck.  Dr. Shuck notes that the patient is over

---

[8] "Dyspneic" means "difficult or labored respiration."  (See www.m-w.com)

11

350 lbs., has hypertension and congestive heart failure on the basis of diastolic dysfunction. The patient was discharged on Lotensin, K-Dor, Labetalol, Cozaar, Protronix, Demadex, Quinadine Sulfate 300 mg g.h.s. and Aldactone. The patient was also on Regian, Lasix, Avalide and Coreg. The patient has remained out of work subsequent to his discharge because of fatigue. It is of note that initially Dr. Shuck felt that the patient could return to work on a physician's statement dated 2/8/03, but on 3/5/03 reversed her decision on this in a letter to whom it may concern stating that the patient had side effects from her medication, as well as persistent fatigue. Our files include the discharge summary from Dr. Shuck. It is of note that at the time of discharge the patient's blood pressure was under excellent control with a systolic blood pressure of 105.

There is no functional evaluation of this patient which would indicate that this patient has persistent congestive heart failure. We do not have any echocardiographic reports.

******

My conclusions would be the following:

1.    The patient clearly does have hypertension, but this has been well-controlled with current medications.

2.    The patient had congestive heart failure. Most likely not on the basis of primary coronary artery disease, but more on the basis of cardiac hypertrophy and what is called a stiff left ventricle or left ventricular diastolic dysfunction. This is very treatable by maintaining blood pressure control and sometimes with the use of diuretics. There is nothing in this file which would indicate that this patient at this time is incapable of sedentary levels of activity and, in fact, it appears that the patient's activities of daily living would be at least at this level.

(A.R. 119-20.) Plaintiff was also notified of her right to bring a civil action challenging the denial of benefits.

On May 7, 2003, MetLife issued the following letter upholding the initial termination of STD benefits:

We reviewed your complete claim, including the following information that was submitted for your appeal:

•    Medical notes regarding a February 6, 2003 evaluation.
•    A letter from Dr. Shuck dated March 5, 2003 addressed "To Whom It May Concern."

12

Disability from your occupation as an Assistant Manager is claimed due to congestive heart failure and hypertension. Short Term Disability benefits were terminated as of February 6, 2003 based on lack of clinical findings to support continued disability.

All medical information in the claim file has been reviewed by an Independent Physician Consultant.

A Physician Questionnaire from Dr. Shuck dated February 5, 2003 indicates you were last seen on February 3, 2003 and had no signs, symptoms or limitations from a cardiac standpoint. A Physician Questionnaire from Dr. Quaye dated February 8, 2003 indicated diagnoses of congestive heart failure and hypertension. Current functional limitations were indicated to be "moderately limited."

The medical notes regarding the February 6, 2003 evaluation indicates your blood pressure was normal (130/86), your chest was clear. You had minimal edema with no cyanosis or clubbing.

The March 5, 2003 letter from Dr. Shuck states that she is treating you for congestive heart failure and malignant hypertension. The letter states that you are very limited due to your cardiovascular status and obesity. The letter also states that you become dyspneic and weak with minimal exertion and are unable to work. The letter does not contain any medical findings to document functional limitations or the reason that she changed her opinion from that stated on the February 5, 2003 Physician Questionnaire.

Objective medical findings in the claim file indicate that you have hypertension but that it is well controlled with current medications. The medical information also indicates that you had congestive heart failure which is treatable by maintaining blood pressure and possible use of diuretics. There is no medical information in the claim file which indicates that this condition has not responded to recommended treatment.

The medical information in the claim file does not document functional limitations which have prevented you from performing the essential duties of your occupation subsequent to February 6, 2003, the date through which Short Term Disability benefits were paid. Therefore, the original claim determination was appropriate.

(A.R. 117-18.) As Plaintiff was not found continuously disabled for more than thirteen (13) weeks,

Plaintiff's claim for LTD benefits was likewise denied.

## Discussion of the Law

**Standard of Review**

The parties stipulate that the proper standard of review is a modified abuse of discretion standard. (Jt. Stip. ¶ 3).[9] Furthermore, the parties stipulate that the Court may dispose of this matter consistent with the submitted joint stipulation, administrative record, and memoranda in support of judgment. (Jt. Stip. ¶ 8).

The abuse of discretion standard applies "where the benefit plan grants the administrator or fiduciary discretionary authority to determine eligibility or to construe the terms of the plan." *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997). Under an abuse of discretion standard, a decision will not be disturbed if it is reasonable, even if the Court disagrees with the ultimate decision. *Feder v. Paul Revere Life Ins. Co.*, 228 F.3d 518, 522 (4th Cir. 2000). When an administrator is granted discretion by the terms of an ERISA plan

> a court reviews the administrator's decision to deny benefits for an abuse of that discretion, asking whether the denial of benefits was reasonable, *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 787 (4th Cir. 1995) (citations omitted), "based on the facts known to [the administrator] at the time." *Sheppard v. Enoch Pratt Hosp., [Inc.*, 32 F.3d 120,] 125 [(4th Cir. 1994)]. An administrator's decision is reasonable "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Bernstein*, 70 F.3d at 788 (internal quotation marks and citation omitted).

*Stup v. Unum Life Ins. Co. of America*, 390 F.3d 301, 307 (footnote omitted).

---

[9] The pertinent plan document provides:

> Under the terms of the Plan, the Claims Administrator is the named fiduciary for adjudicating claims for benefits under the Plan, and for deciding any appeals of denied claims. The Claims Administrator shall have the authority, in its discretion, to interpret the terms of the Plan to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact. All decisions made by the Claims Administrator shall be final and binding on participants and beneficiaries to the fullest extent permitted by law.

(Jt. Stip. ¶; A.R. p. 353.)

The abuse of discretion standard is modified where, as here, a plan fiduciary or administrator is "operating under a conflict of interest." *Ellis*, 126 F.3d at 233. In the instant case, MetLife, as both insurer and administrator of the plan, acted under a conflict of interest because "its decision to deny benefits impacted its own financial interest because it 'both administers the plan and pays for benefits received by its members.'" *Stup*, 390 F.3d at 307. The Supreme Court has instructed that this conflict of interest "*must* be weighed in determining whether there is an abuse of discretion." *Booth v. Wal-Mart Stores, Inc.*, 201 F.3d 335, 342 (4th Cir. 2000) (emphasis in original) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Under a modified abuse of discretion standard, "we will not act as deferentially as would otherwise be appropriate. . . . [T]he fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." *Doe v. Group Hospitalization & Med. Servs.*, 3 F.4d 80, 87 (4th Cir. 1993); *accord Ellis*, 126 F.3d at 233; *Bedrick v. Travelers Ins. Co.*, 93 F3d 149, 152 (4th Cir. 1996).

> Under this sliding-scale standard of review, "[t]he more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision muse be and the more substantial the evidence must be to support it." *Ellis*, 126 F.3d at 233.

*Stup*, 390 F.3d at 307 (footnote omitted).

Since the appropriate standard of review in this case is a modified abuse of discretion, this Court's review is limited to the evidence that was before the claims administrator at the time of the decision.[10] *See Sheppard v. Enoch Pratt Hospital v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir.

---

[10] In contrast, when a district court conducts a de novo review of ERISA benefits claims, i.e., where the benefit plan does not give the administrator or fiduciary discretionary authority to determine eligibility for benefits, it may, in its discretion, consider evidence that was not before the plan administrator. *See*

1994); *see also Bernstein*, 70 F.3d at 788 ("[W]hen a district court reviews a plan administrator's decision under a deferential standard, the district court is limited to the evidence that was before the plan administrator at the time of the decision.").

Plaintiff has sought to include for the Court's consideration descriptions of certain prescription drugs and the potential side effects of those drugs which were not in the Administrative Record. Defendants object to the inclusion of the prescription drug descriptions in the order or the Court's consideration of those side effects on the basis that they "are not in the Administrative Record, Joint Appendix, or any other filing before the Court." (Letter to the Court from J.D. Quattlebaum dated October 5, 2004.) Plaintiff responds by stating "in many cases I have had before the Fourth Circuit, the Fourth Circuit regularly cites to Internet and traditional medical resources to explain the meaning of a condition or the use of a drug. (For instance, see *Bynum v. CIGNA Healthcare of NC, Inc.*, 287 F.3d 305 (4th Cir. 2002). (Letter to the Court from Robert E. Hoskins dated October 6, 2004.)

The Court recognizes that courts routinely use medical resources to explain the medical definition or meaning of a medical condition or the use of a drug. However, the Court feels that in this case, plaintiff is attempting to take it a step further by attempting to put before the Court substantive information concerning possible side effects rather than just explaining complex medical terms or prescription medications that were not presented to the claim administrator. It should be noted that the drugs plaintiff was taking, as well as her own statement concerning the side effects she experienced from those drugs, is already a part of the administrative record. The Court feels that it

---

*Quesinberry v. Life Insurance Co. of North America*, 987 F.2d 1017, 1025 (4th Cir. 1993) (en banc). "The district court should exercise its discretion, however, only when circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review of the benefit decision." *Id.* Admission of such evidence may be warranted "[i]f administrative procedures do not allow for or permit the introduction of the evidence" but not where it is merely "cumulative of what was presented to the plan administrator, or is simply better evidence than the claimant mustered for the claim review." *Id.* at 1027.

would be improper to allow the plaintiff to bolster her testimony with evidence not presented to the claim administrator. Consequently, the Court finds that it would be improper to include in its order or its consideration the additional prescription drug side effect information presented by the plaintiff.

**Plaintiffs' Claim**

The question before the Court is whether, after taking into account any conflict of interest and the evidence before MetLife at the time it made its claim decision, MetLife abused its discretion in concluding that Plaintiff failed to show she was disabled. Under the plan, plaintiff is "disabled" and, therefore, entitled to STD benefits if because of sickness, pregnancy, or accidental injury she is: (1) "receiving appropriate care and treatment from a doctor on a continuing basis;" and (2) "medically unable to perform the essential duties of your own occupation for any employer because of a physical or mental impairment." (A.R. 342.) As noted above, MetLife denied Plaintiff's claim for STD benefits on the ground that the medical evidence presented in support of her claim does not "document functional limitations which . . . prevent[] you from performing the essential duties of your occupation subsequent to February 6, 2003, the date through which Short Term Disability benefits were paid." (A.R. 118.)

A participant's entitlement to an "award of benefits under an ERISA plan is governed in the first instance by the language of the plan itself." *S.S. Trade Ass'n Int'l Longshoreman's Ass'n v. Bowman*, 247 F.3d 181, 183 (4th Cir. 2001). In other words, the written language of an employee benefit plan determines an employee's entitlement to benefits and the amount of those benefits. *See Dameron v. Sinai Hospital Baltimore, Inc.*, 815 F.2d 975, 978 (4th Cir. 1987); *Pizlo v. Bethlehem Steel Corp.*, 884 F.2d 116 (4th Cir. 1989). As claims fiduciary for the plans, MetLife is obligated to

plan participants to follow the written terms and conditions of the plans in reviewing disability claims. *See* 29 U.S.C. § 1104(a)(1)(D); *Pegram v. Herdich*, 530 U.S. 211, 223-24 (2000).

Under the terms of the STD Plan, an employee is required to submit "proof" of disability to MetLife. Additionally, the plaintiff was informed in the letter initially denying benefits: "You were told to have Dr. Quaye's office fax us the reason why he felt you were unable to return to work on February 7, 2003, at which time a further investigation was needed to determine continued eligibility." (A.R. 146-147.) In other words, the plan puts the burden on the employee to establish her disability under the plan. The express terms of the plan tie the definition of disability to the individual employee's functional capacity, i.e., the ability to "to perform the essential duties of your own occupation."

The STD plan places the responsibility on the employee seeking benefits to offer proof to MetLife that the employee is disabled as defined by the STD plan. (A.R. 346.)[11] In the instant case, MetLife determined plaintiff failed to provide sufficient evidence of disability. Plaintiff has failed to show that this denial of benefits was unreasonable. In addition, MetLife acted reasonably in denying

---

[11] The STD plan provides as follows:
> The claims administrators shall have the authority, in their discretion, to interpret the terms of the Plan, to decide questions of eligibility for coverage or benefits under the Plan, and to make any related findings of fact.
> * * *
> You should expect to provide the Claims Administrator with the following information when you call:
> •    Personal information such as name, SSN, date of birth, and current contact information;
> •    Employment information including your manager's name and contact information, your occupation, your last day worked (prior to your disability), and when you expect to return to work;
> •    Medical information including details on your illness or injury, dates of treatment, name and contact information for your physician(s).

(A.R. 340, 346.)

18

benefits under the LTD plan because the plaintiff failed to establish she was continuously disabled for more than thirteen (13) weeks.

In reviewing the plaintiff's claim, MetLife requested the records of both Dr. Shuck, plaintiff's cardiologist, and Dr. Quaye, plaintiff's primary care physician.  As shown in the facts above, the records indicate that plaintiff's physicians were not initially in agreement as to the extent of her limitations and her ability to return to work.  On appeal, plaintiff's treating cardiologist reversed her prior opinion about plaintiff's ability to return to work and stated:

> Ms. Margaretta Zimmerman is a 45-year-old obese black female that we are seeing due to congestive heart failure and malignant hypertension.  The patient is very limited at this point from her cardiovascular status and also from her obesity.  This combination is causing it to be very difficult in order to control her edema and her blood pressure.  The patient is very limited at this point and with any type of activity becomes very dyspneic and weak with minimal exertion.  At this point in time, I do not feel the patient is able to return to work.  Please disregard the updated questionnaire faxed on 02/06/03 since clearly the patient will not be able to return to work at this time.

(A.R. 165.)  Additionally, while Dr. Quaye said that plaintiff's current functional limitations were "moderately limited" and that she was "not able to return [to work] at this time" (February 8, 2003) he did not explain in what ways plaintiff was limited and how they would affect her ability to work.

MetLife had the entire claim file reviewed by an Independent Physician Consultant, J. W. Rodgers, M.D.[12]  After considering all of the plaintiff's records available at the time of review, the Independent Physician Consultant concluded that although the plaintiff was suffering from hypertension, it was "well-controlled with current medication." (A.R. 120.)  He additionally notes:

> The plaintiff had congestive heart failure. . . . This is very treatable by maintaining blood pressure control and sometimes with the use of diuretics.  There is nothing in this file which would indicate that this patient at this time is incapable of sedentary

---

[12] Dr. Rodgers is board certified in Internal Medicine and Pulmonary Medicine and is a Fellow of the American College of Chest Physicians.

19

> levels of activity and, in fact, it appears that the patient's activities of daily living
> would be at least in this level.

(A.R. 120.)  As stated previously, plaintiff's job description indicates that the majority of her time is

spent performing sedentary activity.  (A.R. 152.)  In rendering its final decision, MetLife considered

all of the records in the plaintiff's file as well as the independent review of those records.  Based on

this evidence, MetLife concluded that the plaintiff failed to provide medical evidence sufficient to

demonstrate that plaintiff was disabled and precluded from engaging in her own occupation.

Plaintiff asserts that MetLife abused its discretion by failing to consider the side effects of her

medications.  However, as stated previously, MetLife must render its decision based on the evidence

before it at the time of its decision.  The record shows that plaintiff mentioned some of her

medications and their side effects, such as "constipation, nausea, diarrhea, hemorrhoids, shortness of

breath, bad coughing spells, weakness in legs, hand, arms, fatigue, dry mouth, numbness, pain, and

swelling." (A.R. 168.)  However, neither plaintiff nor her physicians provided evidence of how the

side effects of the medications had or could effect the plaintiff's ability to work at a job that only

requires a sedentary to light work capacity level.  Arguably, while the side effects listed above may

make work uncomfortable, the Court concludes that plaintiff has failed to provide evidence that the

medications made the performance of sedentary work impossible or that she was disqualified and

unable to engage in the duties of her own occupation.  Additionally, while plaintiff may argue that the

medication side effects were not considered by defendants' independent medical consultant, he clearly

noted them in his report and noted the plaintiff's cardiologist expressed concern about them and,

therefore, he did appear to take them into consideration in rendering his opinion.

The Court concludes that based on the evidence before MetLife, a reasonable fiduciary could conclude that, despite her condition, plaintiff was able to perform the duties of her own occupation. After reviewing the Administrative Record and applying the aforementioned standard of review, the Court finds there was substantial evidence to support defendants' denial of benefits, arrived at after a deliberate, principled, reasoning process. While plaintiff may disagree with this determination, this Court must defer to MetLife's decision because it is supported by substantial evidence in the claim record and, therefore, did not constitute an abuse of discretion.

### Conclusion

Based on the evidence before MetLife, the Court concludes that Met Life had a reasonable basis for finding that plaintiff was not disabled. The Court finds that MetLife did not abuse its discretion and, accordingly, is entitled to judgment in this case. It is therefore **ORDERED** that Defendants are granted judgment in their favor.

**IT IS SO ORDERED**.

s/ R. Bryan Harwell
R. Bryan Harwell
United States District Judge

May 31, 2005
Florence, SC